**MIGLIACCIO & RATHOD LLP**
Selin Demir (SBN 331418)
Nicholas Migliaccio, *pro hac vice* anticipated
Jason Rathod, *pro hac vice* anticipated
Bryan Faubus, *pro hac vice* anticipated
388 Market Street, Suite 1300
San Francisco, CA 94111

*Attorneys for Plaintiff and Proposed Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| MARK FEENEY AND JASON FOSSELLA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ROBINHOOD FINANCIAL, LLC, ROBINHOOD SECURITIES, LLC, AND ROBINHOOD MARKETS INC.,<br><br>Defendants. | CASE NO.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**(1) BREACH OF FIDUCIARY DUTY;**<br>**(2) BREACH OF FIDUCIARY DUTY (950 MASS. CODE REGS. 12.200, *et. seq.* );**<br>**(3) BREACH OF CONTRACT;**<br>**(4) IMPLIED COVENANT OF GOOD FAITH & FAIR DEALING;**<br>**(5) NEGLIGENCE;**<br>**(6) GROSS NEGLIGENCE;**<br>**(7) VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW; and**<br>**(8) UNJUST ENRICHMENT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Mark Feeney and Jason Fossella (together, "Plaintiffs") bring this putative class action against Defendants Robinhood Financial, LLC ("Robinhood Financial"), Robinhood Securities, LLC ("Robinhood Securities"), and Robinhood Markets, Inc. ("Robinhood Markets") (collectively, "Robinhood" or the "Company"), and demand a trial by jury. Plaintiffs make the following allegations pursuant to the investigation of counsel, which included a review of, among other things, United States Securities and Exchange Commission ("SEC") filings by Robinhood, as well as regulatory filings and reports, press releases and other public statements issued by Robinhood, and based upon information and belief, except as to the allegations specifically pertaining to each individual Plaintiff, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This is a class action on behalf of all clients of Robinhood who were harmed by Robinhood's manipulation of the market for the following securities and options contracts relating thereto: GameStop Corporation (symbol: GME), BlackBerry Ltd. (symbol: BB), Nokia Oyj (symbol: NOK), AMC Entertainment Holdings, Inc. (symbol: AMC), American Airlines Group Inc (symbol: AAL), Bed Bath & Beyond Inc. (symbol: BBBY), Castor Maritime Inc (symbol: CTRM), Express, Inc. (symbol: EXPR), Koss Corporation (symbol: KOSS), Naked Brand Group Ltd. (symbol: NAKD), Sundial Growers Inc (symbol: SNDL), Tootsie Roll Industries, Inc. (symbol: TR), and Trivago NV (symbol: TRVG) (collectively, the "Manipulated Stocks").[1] Specifically, between the 27th and 28th of January, 2021 (the "Crunch Period"), Robinhood (1) delisted these assets from its trading platform, (2) prohibited its users from purchasing shares of the Manipulated Stocks, only permitting them to sell shares they already owned, (3) unilaterally sold these assets at rock-bottom prices from the accounts of some unlucky

---

[1]      *See* Robinhood Blog, *Keeping Customers Informed Through Market Volatility* (Jan. 28, 2021) *available at* https://blog.robinhood.com/news/2021/1/28/keeping-customers-informed-through-market-volatility (*last visited* Jan. 30, 2021).

---

users without their knowledge or consent, and (4) accepted trade users' orders for these assets and cancelled them unilaterally. On information and belief, Robinhood took these extraordinary actions with the intent to drive down the price of the Manipulated Stocks in order to reduce its own obligations and potential liabilities relating to the Manipulated Stocks.

2.      Plaintiffs assert claims for breach of fiduciary duties, breach of contract, breach of the implied covenant of good faith and fair dealing, negligence, gross negligence, violations of the California Unfair Competition Law, and unjust enrichment, on behalf of themselves and all similarly-situated clients of Robinhood.

3.      Robinhood is a privately-owned financial services company that offers an online platform (typically accessed through their website or through its mobile application (the "App")) for retail investors to purchase and sell securities and similar assets, including stocks, ETFs, option contracts, and cryptocurrency, and engage in trading on margin. The company has no storefront offices and operates entirely online. Robinhood is a FINRA regulated broker-dealer.[1]

4.      The Company has experienced rapid growth since it was launched in 2015: in October 2016 Robinhood reported one million users and by April 2017 its active user base had doubled and was growing at a rate of 140,000 new accounts per month.[2] As of October 2018, Robinhood's users had "executed more than $150 billion in transactions."[3] By 2017 the Company

---

[2]      Josh Constine, *Robinhood Stock-trading App Confirms $110M Raise at $1.3B Valuation*, Techcrunch (April 26, 2017), *available at* https://techcrunch.com/2017/04/26/robincorn/ (*last visited* Jan. 30, 2021).

[3]      Simone Foxman, Julie Verhage, and Suzanne Woolley, *Robinhood Gets Almost Half Its Revenue in Controversial Bargain With High-Speed Traders*, Bloomberg.com (October 15, 2018), *available at* https://www.bloomberg.com/news/articles/2018-10-15/robinhood-gets-almost-half-its-revenue-in-controversial-bargain-with-high-speed-traders. (*last visited* Jan. 30, 2021).

CLASS ACTION COMPLAINT

was valued at $1.3 billion and one year later it received a valuation of $5.6 billion.[4] In 2019, Robinhood raised $323 million in funding at a $7.6 billion valuation. The firm currently claims over 10 million users of its App.

5.      Robinhood pioneered "commission-free investing," and offers its customers "unlimited commission-free trades in stocks, funds, and options."[5] Robinhood's users do not pay trade commissions, but they pay a hidden price with every trade.

6.      When a Robinhood user executes a trade, their order is sent to a private exchange where it is executed by a third-party, generally on less favorable terms than if the trade had been executed on the major exchanges. Robinhood's practice of selling its users orders to third parties is known as selling "order flow," and Robinhood derives the majority of its profit from this practice.[6] Retail order flow from Robinhood is generally executed in so-called "dark pools," private exchanges run by banks, hedge funds, high-frequency trading firms, and other financial institutions. This is a lucrative arrangement for the dark pools, who extract profit from retail customers and gather valuable information about market trends with each trade.

7.      Robinhood's order flow practices have landed it in hot water with the SEC, and the Company is also subject to ongoing investigations by the SEC, FINRA, and state regulators regarding how it handled service disruptions that left its users unable to trade during some of the

---

[4]     Alex Wilhelm, *Thinking About Revenue Growth As Robinhood Said To Pursue New Capital, Higher Valuation*, Crunchbase (May 24, 2019) *available at* https://news.crunchbase.com/news/thinking-about-revenue-growth-as-robinhood-said-to-pursue-new-capital-higher-valuation/ (*last visited* Jan. 30, 2021).
[5] *See* https://robinhood.com/.
[6] Kate Rooney, *A Controversial Part of Robinhood's Business Tripled in Sales Thanks to High-Frequency Trading Firms*, CNBC.com (April 18 2019), *available at* https://www.cnbc.com/2019/04/18/a-controversial-part-of-robinhoods-business-tripled-in-sales-thanks-to-high-frequency-trading-firms.html (*last visited* Jan. 30, 2021).

CLASS ACTION COMPLAINT

biggest market swings of 2020 (costing them millions),[7] and "'unscrupulously' pushing unsophisticated customers into risky investments."[8]

8.     During its short history Robinhood has repeatedly mislead and mistreated its customers, but the Company hit a new low during the Crunch Period, when it openly used its trading platform to manipulate the price of certain securities at the expense of Plaintiffs and the putative class (the "Class").

9.     For example, on or around January 27, 2021, Robinhood abruptly restricted its users' ability to trade in shares and options relating to GameStop Corporation ("GME"). For approximately two weeks preceding this action, GME's price had increased from approximately $18.60, on January 11, 2021, to nearly $415, on January 27—an increase of over 2,200%. On the morning of January 27, Robinhood users who searched for GME discovered that Robinhood had restricted its users' ability to purchase GME shares or enter into options pertaining to GME. The stock was obscured on Robinhood's website and App, and users who found the listing were unable to enter purchase orders for GME. Users who already owned GME were permitted only to sell the shares they held. Further, Robinhood unilaterally cancelled some users' GME trades after accepting them and, incredibly, unilaterally and without prior notice sold GME shares in its users accounts at prices that were lower than the lowest recorded price of the day.

---

[7]     Kelly Anne Smith, *Robinhood Facing Multiple SEC Investigations Into Its Business Practices*, Forbes.com (Sep. 3, 2020), *available at* https://www.forbes.com/sites/advisor/2020/09/03/robinhood-investigation-sec-finra/?sh=178f09214d61 (last visited Jan. 30, 2021).

[8]     Nathaniel Popper and Michael J. de la Merced, Robinhood Pays $65 Million Fine to Settle Charges of Misleading Customers (Dec. 17, 2020), *available at* https://www.nytimes.com/2020/12/17/business/robinhood-sec-charges.html (*last visited* Jan. 30, 2021).

CLASS ACTION COMPLAINT

1    10.    Around the same time, Robinhood took similar actions regarding the other

2 Manipulated Stocks. Like GME, those securities had also experienced a rally in the previous two

3 weeks. Their listings were similarly obscured on Robinhood's website and users were restricted

4 from purchasing shares in these companies or entering into options on them. Robinhood permitted

5 its millions of users only to sell the Manipulated Stocks, giving them no way to purchase through

6 its platform. Robinhood also unilaterally cancelled orders and sold these assets from its users'

7 accounts without prior notice.

8    11.    As a direct consequence of Robinhood's actions, the value of the Manipulated

9 Stocks and related options dropped precipitously—by the end of January 28, 2021 AMC had

10 fallen by nearly 50%, GME by nearly 25%, NOK by nearly 25%, and BB by nearly 35%. The

11 other Manipulated Stocks also experienced marked declines in their values after Robinhood

12 restricted trading in them.

13    12.    On January 28, Robinhood released a statement claiming that it limited trading in

14 the Manipulated Stocks to comply with "SEC net capital obligations and clearinghouse deposits"

15 and to "protect investors and the markets."[9] The statement continues: "To be clear, this was a

16 risk-management decision, and was not made on the direction of the market makers we route to."

17    13.    This explanation is false and misleading: on information and belief, Robinhood

18 took these unprecedented actions with the intent to drive down the price of the Manipulated

19 Shares to benefit Robinhood and "the market makers [they] route to." By manipulating the market

20 to lower the prices of the Manipulated Stocks, Robinhood (1) saved likely hundreds of millions

21 of dollars in costs relating to call options on the Manipulated Stocks, (2) artificially lowered its

23

24 [9]    Robinhood Blog, *An Update on Market Volatility* (Jan. 28, 2021) *available at*
https://blog.robinhood.com/news/2021/1/28/an-update-on-market-volatility (*last visited* Jan. 30,
25 2021).

CLASS ACTION COMPLAINT

margin requirement and capital obligations that result from Robinhood operating an in-house clearing service subject to Depository Trust and Clearing Corporation ("DTCC") regulation; and (3) reduced the costs of shorting the Manipulated Stocks, which benefitted Robinhood's close institutional partners and reduced the Company's exposure to short positions.

14.     Robinhood's Hail Mary worked: it reduced its obligations and its risk exposure, but at the direct expense of its retail users. Preventing users from purchasing Manipulated Stocks during the Crunch Period unfairly and unlawfully deprived them of the benefit of their bargain with Robinhood, which promised "unlimited commission-free trades in stocks, funds, and options" for trading on its platform, as well as the benefits they otherwise would have received from the upwards price trends. In fact, the latter is true of the entire market: Robinhood's actions caused significant losses for all long positions in the Manipulated Stocks and options related thereto. And Robinhood breached its duties to its users when it cancelled retail purchases and liquidated its holdings of the Manipulated Securities to boost the supply of Manipulated Stocks.

15.     Robinhood's behavior constitutes negligence, breaches of contract and fiduciary duties, and violates FINRA regulations. Per FINRA regulations, Robinhood has a duty to process trades timely and at the best prices for its users. Robinhood is also required to have a business continuity plan identifying a procedure relating to an emergencies or significant business disruptions. During the Crunch Period, Robinhood failed to process trades in a timely manner, or at all, and sold its users' holdings for its own benefit. Robinhood's trading restrictions, trade cancellations, and unilateral sales of customer assets caused concrete, particularized, and actual damages for the Class.

16.     At all relevant times, Robinhood failed to disclose that orders on its platform would be subject to extraordinary measures that subordinated the financial interests of its retail clients to its own financial interests. On January 27, 2021, Robinhood decided that, by the next

CLASS ACTION COMPLAINT

day, it would impose extraordinary measures – including the unilateral cancelation or sale of Manipulated Stocks – and also decided that it would *not* inform its clients, but rather, continue to accept the orders, telling clients that such orders would be executed in the same manner as any other order.

17.     Plaintiffs hereby seek to recover, on behalf of themselves and all similarly situated clients of Robinhood, the value they lost on account of Robinhood's self-interested market manipulation as well as restitution of benefits unjustly received by Robinhood at their expense.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over the claims asserted herein pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332 (d)(2), since some of the members of the putative class (defined below) are citizens of a State different from that of the Defendant and, upon the original filing of this Complaint, members of the putative class resided in states around the country; there are more than 100 putative class members; and the amount in controversy exceeds $5 million, exclusive of interest and costs.

19.     The Court has personal jurisdiction over the parties because Robinhood conducts a major part of its national operations, advertising, and sales through continuous business activity in this District.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Robinhood and Robinhood Markets both reside in this District. The principal executive office of both companies is located at 85 Willow Road, Menlo Park, CA 94025. Further, many of the acts alleged herein that give rise to the injuries suffered by the Plaintiffs and the Class occurred in substantial part in this District.

**PARTIES**

21.    Plaintiff Feeney is a client of Robinhood and was continuously during the Class Period. Plaintiff Feeney is a resident of the Commonwealth of Massachusetts.

22.    Plaintiff Fossella is a client of Robinhood and was continuously during the Class Period. Plaintiff Fossella is a resident of the state of Missouri.

23.    Defendant Robinhood Markets, Inc. is a Delaware corporation, with its principal executive offices at 85 Willow Road, Menlo Park, CA 94025. Defendant Robinhood Markets is the corporate parent of Defendants Robinhood Financial and Robinhood Securities.

24.    Defendant Robinhood Securities, LLC is a Delaware corporation with its principal place of business at 500 Colonial Center Parkway, Suite 100, Lake Mary, Florida 32746. It is a wholly- owned subsidiary of Defendant Robinhood Markets.

25.    Defendant Robinhood Financial, LLC is a Delaware limited liability company, with its principal executive offices at 85 Willow Road, Menlo Park, CA 94025. It is a wholly-owned subsidiary of Robinhood Markets. Robinhood Financial is registered as a broker-dealer with the U.S. Securities & Exchange Commission ("SEC"). Defendant Robinhood Financial acts as an introducing broker and has a clearing arrangement with its affiliate Defendant Robinhood Securities.

**FACTUAL BACKGROUND**

***Robinhood's Business Model***

26.    Robinhood was founded in 2013 by Vlad Tenev and Baiju Bhatt, who met each other at Stanford University in 2005. After teaming up on several ventures, including a high-speed trading firm, they created Robinhood.[8]

27.    The Company has experienced rapid growth since it was launched in 2015: in October 2016 Robinhood reported one million users and by April 2017 its active user base had

doubled and was growing at a rate of 140,000 new accounts per month.[10] As of October 2018, Robinhood's users had "executed more than $150 billion in transactions."[11] By 2017 the Company was valued at $1.3 billion and one year later it received a valuation of $5.6 billion.[12] In 2019, Robinhood raised $323 million in funding at a $7.6 billion valuation. The firm currently claims over 10 million users of its App.

28.     Robinhood offers its users the ability to invest in stocks, ETFs, and options through an electronic trading platform. Robinhood competes with other online and traditional retail brokerages by not charging up-front fees for trades. Robinhood also competes with traditional financial institutions by offering more user-friendly digital services, which has made Robinhood very popular, especially with younger traders. In July of 2020, Robinhood said it had over 13 million users on its platform. In August 2020, after raising $200 million in Series G funding, Robinhood was valued at $11.2 billion.[13]

### *Robinhood's Services, How it Makes Money, and How it Minimizes Short-Term Costs*

29.     When a user opens an account with Robinhood, they enter into a Customer Agreement with "Robinhood Financial LLC, Robinhood Securities, LLC, and their agents and

---

[10]     Josh Constine, *Robinhood Stock-trading App Confirms $110M Raise at $1.3B Valuation*, Techcrunch (April 26, 2017), *available at* https://techcrunch.com/2017/04/26/robincorn/ (*last visited* Jan. 30, 2021).

[11]     Simone Foxman, Julie Verhage, and Suzanne Woolley, *Robinhood Gets Almost Half Its Revenue in Controversial Bargain With High-Speed Traders*, Bloomberg.com (October 15, 2018), *available at* https://www.bloomberg.com/news/articles/2018-10-15/robinhood-gets-almost-half-its-revenue-in-controversial-bargain-with-high-speed-traders. (*last visited* Jan. 30, 2021).

[12]     Alex Wilhelm, *Thinking About Revenue Growth As Robinhood Said To Pursue New Capital, Higher Valuation*, Crunchbase (May 24, 2019) *available at* https://news.crunchbase.com/news/thinking-about-revenue-growth-as-robinhood-said-to-pursue-new-capital-higher-valuation/ (*last visited* Jan. 30, 2021).

[13]     Kate Rooney, *Robinhood snags third mega-investment of the year, boosting valuation to $11.2 billion,* CNBC (August 17, 2020) https://www.cnbc.com/2020/08/17/robinhood-announces- another-mega-round-valuation-soars-to-11point2b.html (*last visited* Jan. 30, 2021).

CLASS ACTION COMPLAINT

assigns." Robinhood offers a paid subscription product called "Gold." Users who purchase Gold memberships pay $5 a month to have faster deposit processing, access to professional research, the ability to see additional information about stock prices, and the ability to invest on margin.[14]

30.     Robinhood generates the majority of its revenue from "payment for order flow" fees. In fact, payment for order flow fees are reportedly Robinhood's primary revenue stream—greatly exceeding what it earns from Robinhood Gold, or from the interest it makes on cash balances in customer accounts, which is another source of Robinhood's revenue.

31.     Third-party market makers pay Robinhood for "order flow," the right to execute trades for Robinhood's users. For example, if a Robinhood user purchases a share of Apple through their account, Robinhood sends that order to a large market maker like Citadel Securities and receives a few pennies in return—*i.e.*, the "payment for order flow" fees. Citadel, meanwhile, makes a few pennies itself by completing the trade for a higher price than it paid for a share of Apple.[15]

32.     For Robinhood, those fees add up. According to a recent SEC filing, Citadel Securities and several other firms paid Robinhood nearly $100 million in the first quarter of 2020[16] And in the second quarter of 2020 Robinhood made $180 million selling order flow, almost doubling the prior quarter.[17]

---

[14]     A margin account is a brokerage account in which the broker lends the investor money to buy more securities than what they could otherwise buy with the balance in their account.
[15]     Jeff John Roberts, David Z. Morris, *Robinhood makes millions selling your stock trades ... is that so wrong?,* Fortune (July 8, 2020), https://fortune.com/2020/07/08/robinhood-makes-millions-selling-your-stock-trades-is-that-so-wrong/ (*last visited* Jan. 30, 2021).
[16] *Id.*
[17]     Kate Rooney, Maggie Fitzgerald, *Here's how Robinhood is raking in record cash on customer trades — despite making it free*, CNBC (August 13, 2020), https://www.cnbc.com/2020/08/13/how-robinhood-makes-money-on-customer-trades- despite-making-it-free.html?__source=iosappshare%7Ccom.apple.UIKit.activity.Mail (*last visited* Jan. 30, 2021).

CLASS ACTION COMPLAINT

33.     Robinhood's order flow practices have landed it in hot water with the SEC. On December 17, 2020, the SEC announced that it had charged Robinhood "for repeated misstatements that failed to disclose the firm's receipt of payments from trading firms for routing customer orders to them, and with failing to satisfy its duty to seek the best reasonably available terms to execute customer orders."[18] The SEC found that Robinhood's practices "had deprived customers of $34.1 million even after taking into account the savings from not paying a commission." The Company paid $65 million to settle the charges.

34.     Robinhood offers its customers the ability to buy and sell options, including "calls."[19] A call is "an option contract under which the holder of the option has the right, in accordance with the terms of the option, to purchase the number of units of the underlying security" at a specific price—known as the "strike price."[20] A call option is a bet that the value of a security will increase. A call option will expire at a predetermined date; typically options expire in batches at regular intervals. If a call is "in the money," *i.e.*, the market price is higher than the strike price, on or before the expiration date, the call holder will exercise the right to purchase the shares, and the counterparty is obligated to sell the securities at the strike price.

35.     On information and belief, Robinhood sold call options on the Manipulated Stocks that expired on January 29, 2021.

---

[18]     Press Release, SEC, *SEC Charges Robinhood Financial With Misleading Customers About Revenue Sources and Failing to Satisfy Duty of Best Execution* (Dec. 17, 2020), *available at* https://www.sec.gov/news/press-release/2020-321 (*last visited* Jan. 30, 2021).
[19]     *See* Robinhood Support, *Placing an Options Trade*, *available at* https://robinhood.com/us/en/support/articles/placing-an-options-trade/ (*last visited* Jan. 30, 2021).
[20]     FINRA 2360. Options https://www.finra.org/rules-guidance/rulebooks/finra-rules/2360 (*last visited* Jan. 30, 2021).

CLASS ACTION COMPLAINT

36.     Robinhood also allows its users to "short" securities. A short trade is a "trading strategy where you borrow shares of a stock, sell them at the current price, and hope the price falls so that you can repay the borrowed shares at a lower price."[21] A short seller is required to pay regular "interest" to keep the short position open, and when the price of a shorted stock rises the amount of interest required rises as well, necessitating additional collateral from the short seller. If a short seller wishes to exit the trade they are required to purchase shares at the market price to return to the lender, settling the trade.

37.     On information and belief, Robinhood lent securities to both its users and to institutions like hedge funds for the purpose of being used in short trades.

38.     Robinhood exposed itself to risk by operating its own clearing service rather than, as most brokers do, paying an external clearing house to reconcile trades between buyers and sellers. It typically takes roughly two days for an equities trade to legally settle. By "self-clearing," Robinhood takes on the risk of one side defaulting and the trade not settling. To manage risk to the market, the DTCC requires clearing brokers to post margin. Perceived market volatility and trading surges prompt DTCC to demand more collateral. Robinhood has knowingly created the conditions for persisting volatility and trading surges, but refused to hold adequate collateral to meet its self-clearing obligations without relying on exploitation of its clients.

39.     Robinhood knew of the risks posed by self-clearing but transitioned to the model in 2018 because doing so enabled it to maximize short-term profit through rapidly building its

---

[21]     *See* Robinhood Support, *What is Short Selling?*, *available at* https://learn.robinhood.com/articles/7CPnasX4CZXQioJgHTMeXg/what-is-short-selling/ (*last visited* Jan. 30, 2021).

subscriber base and also saving on costs paid to an external clearing house.[22] To its clients, it never disclosed such risks, opting instead to tout self-clearing as "pass[ing] more savings to our customers," "accelerat[ing] future product iterations," and aligning with Robinhood's "mission of **democratizing access to the financial markets**." (emphasis in original).[23]

### *The Crunch Period*

40.     Or around January 27, 2021, Robinhood abruptly restricted its users' ability to trade in shares and options relating to the Manipulated Stocks. For approximately two weeks preceding this date, the value of these stocks had risen dramatically. For example, GME's price had increased from approximately $18.60, on January 11, 2021, to nearly $415, on January 27—an increase of over 2,200%. On the morning of January 27, Robinhood users who searched for Manipulated Stocks on the website or App found a message that "This stock is not supported on Robinhood."[24]

41.

---

[22]     *See* Josh Constine, Robinhood cuts trading fees, grows profits with in-house clearing, Tech Crunch (Oct. 10, 2018), available at https://techcrunch.com/2018/10/10/robinhood-clearing/ (*last visited* Jan. 31, 2021).

[23]     *See* Hongxia Zong, Under the hood of clearing by Robinhood (Oct. 16, 2018), available at https://robinhood.engineering/under-the-hood-of-clearing-by-robinhood-3ed7ab09d60 (*last visited* Jan. 31, 2021).

[24]     Josh Fineman, Robinhood locks out traders from GameStop, AMC, Nokia and others, SeekingAlpha.com (Jan. 28, 2021), *available at* https://seekingalpha.com/news/3655535-watch-gamestop-amc-as-robinhood-reportedly-locking-out-traders (*last visited* Jan. 30, 2021).

CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16



17   42.     Robinhood also restricted its users' ability to purchase shares or enter into options

18   pertaining to them. Users could not buy the Manipulated Stocks Users; their "buy" option on

19   Robinhood's platform had been rendered non-operational. Users who already owned GME were

20   permitted only to sell the shares they held.

21   43.

22

23

24

25

CLASS ACTION COMPLAINT

44.     Further to these actions, Robinhood reneged on purchases of the Manipulated Stocks after accepting them, unilaterally cancelling these orders and wrongfully ascribing the cancellation to the users. Robinhood also sold GME shares from its users accounts unilaterally and without prior notice. Worse still, at least some of these forced liquidations were at a price lower than the lowest recorded price of the day—$118.93 versus the nadir of $132.

CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18



19    46.    On information and belief, Robinhood's actions regarding the Manipulated Stocks,

20 that is, its all-out effort to reduce the price of those stocks, were motivated by its need to reduce

21 its own mounting obligations under options contracts and potential liabilities relating to short

22 positions on the Manipulated Stocks.

23    47.    A large number of call options on the Manipulated Stocks were scheduled to expire

24 on Friday, January 29, 2021. Due to the massive increase in the value of the Manipulated Stocks

25

CLASS ACTION COMPLAINT

over the previous two weeks, the vast majority of those calls were in-the-money and therefore likely to be exercised. When the buyers exercised those calls, Robinhood would be obligated to provide shares for purchase at the strike price. If Robinhood had not already covered these calls, *e.g.*, by holding shares of the Manipulated Stocks in its own inventory, Robinhood would be forced to purchase shares at the then market price, which likely was much higher than the strike prices of the expiring options.

48.     On information and belief, Robinhood saved hundreds of millions of dollars by manipulating the market for the Manipulated Stocks. It cost Robinhood much less to cover its call option liabilities after depressing the price of the Manipulated Stocks.

49.     Robinhood's scheme also benefitted its institutional partners who were shorting the Manipulated Stocks.

50.     Prior to the Crunch Period, short sellers had taken large positions against the Manipulated Stocks, GME in particular. In fact, as of the date of the Crunch Period, there were more GME shares sold short (*i.e.*, borrowed and sold at one price with an obligation to purchase and return the shares in the future) than there were GME shares in circulation.[25] This is possible because one share can be borrowed and sold multiple times.

51.     As discussed above, the majority of Robinhood's income is derived from selling order flow to hedge funds for execution in dark pools. Robinhood's biggest order flow customer is Citadel Securities LLC, the sister company of hedge fund Citadel LLC.[26]  Days prior to the

---

[25]     Dan Caplinger, *Yes, a Stock Can Have Short Interest Over 100% -- Here's How*, The Motley Fool (Jan. 28, 2021), *available at* https://www.fool.com/investing/2021/01/28/yes-a-stock-can-have-short-interest-over-100-heres/ (*last visited* Jan. 30, 2021).

[26] *See* Jeff John Roberts, David Z. Morris, *Robinhood makes millions selling your stock trades ... is that so wrong?,* Fortune (July 8, 2020), https://fortune.com/2020/07/08/robinhood-makes-millions-selling-your-stock-trades-is-that-so-wrong/ (*last visited* Jan. 30, 2021); Simone Foxman,

CLASS ACTION COMPLAINT

Crunch Period, Citadel LLC came into a very large short position (as large as $2 billion) against GME and possibly other of the Manipulated Stocks after it contributed $2 billion to bail out another hedge fund, Melvin Capital Management, after it lost nearly one third of its assets in January 2021.[27] Melvin Capital's losses were in large part attributable to its sizable short position on GME. Citadel LLC received "revenue shares" in Melvin Capital Management, and its contribution "reduc[ed] Melvin's reliance on borrowed money," effectively making their short positions less expensive to maintain.[28]

52.      Robinhood's extraordinary actions further reduced the cost of maintaining short positions on the Manipulated Stocks, as well as the cost of exiting those positions (*i.e.*, buying shares at the then market price). It is clear that Robinhood benefitted from the reduced cost of maintaining and exiting short positions on the Manipulated Stocks.

53.      The reduction in the prices of the Manipulated Stocks was a boon to short sellers and, consequentially, a relief to broker-dealers who are exposed to short positions by virtue of being involved in those trades. That is, broker-dealers who lend shares for short sales are exposed to counterparty risk: if the short seller counterparty is unable to provide collateral to maintain their position or close out the trade by covering the position (for example, due to insolvency), then the broker-dealer has a potentially expensive problem.

---

Julie Verhage, and Suzanne Woolley, *Robinhood Gets Almost Half Its Revenue in Controversial Bargain With High-Speed Traders*, Bloomberg.com (October 15, 2018), *available at* https://www.bloomberg.com/news/articles/2018-10-15/robinhood-gets-almost-half-its-revenue-in-controversial-bargain-with-high-speed-traders (*last visited* Jan. 30, 2021).

[27]      Juliet Chung, Citadel, Point72 to Invest $2.75 Billion Into Melvin Capital Management, WSJ.com (Jan. 25, 2021), *available at* https://www.wsj.com/articles/citadel-point72-to-invest-2-75-billion-into-melvin-capital-management-11611604340 (*last visited* January 30, 2021).
[28]      *Id.*

54.     On information and belief, Robinhood lent shares of the Manipulated Stocks for the purpose of short selling and as a result was exposed to counterparty risk arising from the possibility that its short counterparties would be unable to maintain or exit their trades. As the price of the Manipulated Stocks rose, short sellers were required to provide more collateral/pay higher fees to maintain their positions. And if they chose to exit their positions, they would have to purchase shares at the market price. The cost of maintaining or exiting a short position can be immense when the shorted stock rises suddenly, as here, over two thousand per cent for GME. By reducing the value of the manipulated shares, Robinhood made the short position less expensive to maintain or exit, and thereby reduced the risk of an insolvent counterparty and the potential liabilities arising therefrom.

55.     Robinhood also had growing collateral obligations from the DTCC. In one day, the industry collateral requirements for the entire equity market grew from $26 billion to $33.5 billion, an amount easy to weather for established players who appropriately plan for such contingencies, but less so for Robinhood who did not.

56.     It is clear that Robinhood was feeling pressure resulting from the rising prices of the Manipulated Stocks and its collateral obligations to the DTCC. The Company faced not just risk but mounting expenses tied to the Manipulated Stocks, so much so that it was forced to raise over $1 billion the night of January 28th from investors to "shore up its balance sheet."[29] Robinhood also drew down an additional $500 million from various credit lines "to ensure it had

---

[29]     Maggie Fitzgerald, *Robinhood raises $1 billion and taps credit lines to make trading of GameStop available to customers*, CNBC.com (Jan. 29, 2021), *available at* https://www.cnbc.com/2021/01/29/robinhood-raises-1-billion-and-taps-credit-lines-to-make-trading-of-gamestop-available-to-customers.html (*last visited* January 30, 2021).

CLASS ACTION COMPLAINT

1    the capital required to keep allowing its clients to trade heavily shorted stocks like GameStop and

2    AMC Entertainment."[30]

3        57.    Without its extraordinary actions earlier in the day to reduce the price of the

4    Manipulated Stocks, Robinhood would have required an infusion even larger than $1.5 billion.

5    Robinhood's savings, however, came at the expense of its customers, who were prevented from

6    purchasing the Manipulated Stocks, whose orders were limited or unilaterally cancelled, and

7    whose holdings were unilaterally liquidated at rock-bottom prices.

8    ***Plaintiffs' Experiences***

9        **Mark Feeney**

10       58.    Plaintiff Feeney is a Robinhood client.

11       59.    On the evening of January 27, 2021, Plaintiff Feeney placed a market buy order

12   for GME and received confirmation at around 10:30 p.m. that the order would be executed. At

13   around 9:30 a.m. the next morning, Plaintiff Feeney received – in his spam folder of his email –

14   a notification of cancelation of the order. At 9:30 a.m., GME was trading at $265 a share.

15       60.    At closing on January 28, 2021, Plaintiff Feeney was led to believe that trading

16   of GME had reopened and placed another market buy order. This order, too, was canceled

17   because Robinhood had restricted trading of fractional shares. Plaintiff Feeney then placed

18   another buy order before trading reopened on January 29, 2021, but it was not filled until 10:30

19   a.m. and, then, executed at one of the highest prices of the previous days, at $355 for one share.

20       61.    Plaintiff Feeney suffered losses because he could have bought at a lower price had

21   Robinhood executed the trade in accordance with its duty as a broker and promises made to

22   customers. Thereafter, the stock price would have continued to rise but for Robinhood's market

---

[30]   *Id.*

manipulation.

62.     Had Plaintiff Feeney known his orders would be canceled, he would not have placed the orders and would have arranged for the trades with another brokerage. Since the incident, Plaintiff Feeney has established a brokerage account with Fidelity. Unfortunately, though, bank approval is required before he can start using that account, which will take 4-6 business days.

**Jason Fossella**

63.     Plaintiff Fossella is a Robinhood client.

64.     On the evening of January 27, 2021, Plaintiff Fossella placed a market buy order for shares of NOK and received confirmation at 1:16 a.m. on January 28, 2021. The message did not indicate the possibility that the order could be canceled; rather it said: "You have submitted a market order to buy 9.541984 shares of NOK. You can check on the status of this order on Robinhood. We will notify you when this order has been executed."

65.      At 9:35 a.m. the next morning, Plaintiff Fossella received a notification of cancelation of the order. At 9:30 a.m., NOK was trading at $5.18 a share.

66.     Plaintiff Fossella suffered losses because he could have bought at a lower price had Robinhood executed the trade in accordance with its duty as a broker and promises made to customers. Thereafter, the stock price would have continued to rise but for Robinhood's market manipulation.

67.     Had Plaintiff Fossella known his order would be canceled, he would not have placed the order with Robinhood and would have arranged for the trades with another brokerage.

CLASS ACTION COMPLAINT

### *Regulatory Framework*

68.     As a broker-dealer, Robinhood is subject to various rules and regulations that impact many aspects of its business.

69.     Under federal and state securities laws, securities industry rules, and industry best practices, brokerage firms that offer online trading services to their customers are required to, among other things, ensure that customers receive the best execution of trades. FINRA, which superseded the NASD, and now governs brokers like Robinhood, promulgated rule 5310 regarding "Best Execution and Interpositioning." Rule 5310.01 requires that Robinhood "must make every effort to execute a marketable customer order that it receives promptly and fully." By accepting and cancelling its customers' trades, and in fact, preventing them from buying altogether, Robinhood has breached these obligations and caused its customers substantial losses due solely to its own negligent and fraudulent actions.

70.     Brokers engaged in routing orders for their clients are under a duty of "best execution," pursuant to Rule 5310. Rule 5310 sets forth a non-exhaustive list of factors to be considered by brokers when routing order flow:

> In any transaction for or with a customer or a customer of another broker-dealer, a member and persons associated with a member shall use reasonable diligence to ascertain the best market for the subject security and buy or sell in such market so that the resultant price to the customer is as favorable as possible under prevailing market conditions. Among the factors that will be considered in determining whether a member has used "reasonable diligence" are:
> (A) the character of the market for the security (*e.g.*, price, volatility, relative liquidity,
> and pressure on available communications);
>
> (B) the size and type of transaction;
>
> (C) the number of markets checked;
> (D) accessibility of the quotation; and
>
> (E) the terms and conditions of the order which result in the transaction, as communicated to the member and persons associated with the member.

–23–

71. The SEC, in Order Execution Obligations Release, No. 34-37619A (the "SEC Release"), instructs that a "broker-dealer's duty of best execution derives from common law agency principles and fiduciary obligations, and is incorporated in [self-regulatory organization] rules and, through judicial and SEC decisions, the antifraud provisions of the federal securities laws. This duty of best execution requires a broker-dealer to seek the most favorable terms reasonably available under the circumstances for a customer's transactions." That is, brokers have a responsibility to execute orders in a manner that is most beneficial to their clients and are prohibited from taking actions that are not in their clients' best interests.

72. The SEC Release further states that:

> The duty of best execution evolves as changes occur in the market that give rise to improved executions for customer orders, including opportunities to trade at more advantageous prices. As these changes occur, broker-dealers' procedures for seeking to obtain best execution for customer orders also must be modified to consider price opportunities that become "reasonably available."

73. States also impose regulatory requirements on brokers, including a fiduciary duty to clients. For example, Massachusetts imposes a fiduciary duty on broker-dealers that requires them to adhere to duties of utmost care and loyalty to clients. The duty of care requires a broker-dealer to use the care, skill, prudence, and diligence that a person acting in a like capacity and familiar with such matters would use, taking into consideration all of the relevant facts and circumstances. The duty of loyalty requires a broker-dealer to: (1) disclose all material conflicts of interest; (2) make all reasonably practicable efforts to avoid conflicts of interest, eliminate conflicts that cannot reasonable be avoided, and mitigate conflicts that cannot reasonably be avoided or eliminated and (3) make recommendations and provide investment advice without regard to the financial or any other interest of any party other than the customer. On December 16, 2020, the Massachusetts Securities Division of the Office of the Secretary of the

Commonwealth sued Robinhood for numerous violations of Robinhood's fiduciary duty to customers.

## CLASS ALLEGATIONS

74.     Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure for the purpose of asserting the claims alleged in this Complaint on a common basis. Plaintiffs bring this action on behalf of themselves and all members of the following Nationwide Class comprised of:

> **All clients of Robinhood in the United States who, from January 27, 2021, to January 29, 2021 (1) placed orders in the Manipulated Stocks that were not executed, or (2) possessed Manipulated Stocks that Robinhood sold without their consent.**

75.     Plaintiff Feeney also brings this action on behalf of himself and a Massachusetts Subclass comprised of:

> **All clients of Robinhood in Massachusetts who, from January 27, 2021, to January 29, 2021 (1) placed orders in the Manipulated Stocks that were not executed, or (2) possessed Manipulated Stocks that Robinhood sold without their consent.**

76.     Excluded from the Class and Subclass are the officers, directors, and employees of Robinhood. Also excluded are the judge to whom this case is assigned any member of the judge's immediate family.

77.     Plaintiffs reserves the right to modify or amend the definitions of the Class as the case proceeds.

78.     Numerosity. *Rule 23(a)(1)*. The members of the Class are so numerous that their individual joinder is impracticable. Defendants service over three million brokerage accounts. Plaintiffs are informed and believe that the proposed Class contains at least hundreds of thousands of Defendants' clients who have been damaged by Robinhood's conduct as alleged herein. Record owners and other members of the Class may be identified from records

CLASS ACTION COMPLAINT

maintained by Robinhood and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

79.     *Existence of Common Questions of Law and Fact. Rule 23(a)(2).* This action involves common questions of law and fact, which include, but are not limited to, the following:

a.      whether Defendants' promises to provide, and assertions that they do provide, best execution of their clients' orders upon due consideration of the delineated regulatory factors, as discussed herein, are true, or are reasonably likely to deceive, given the omissions of material fact described above;

b.      whether statements made by the Defendants' officers, directors, and employees to the investing public during the Class Period failed to disclose material information about Robinhood's policies that would have rendered Defendants' best execution promises not misleading;

c.      whether Defendants' statements about providing best execution of their clients' orders were merely recitations of their legal obligations and not consistent with their actual practices;

d.      whether Plaintiffs and the other members of Class are entitled to damages; and

e.      whether Plaintiffs and the Class are entitled to injunctive relief, restitution, other equitable relief, and/or other relief as may be proper.

80.     *Typicality. Rule 23(a)(3).* All members of the Class have been subject to and affected by the same conduct and omissions by Defendants. The claims alleged herein are based on the same violations by Defendants that harmed Plaintiffs and members of the Class. By placing orders in connection with which Defendants failed to act upon due consideration of their duty of best execution, all members of the Class were subjected to the same wrongful conduct. Plaintiffs' claims are typical of the Class' claims and do not conflict with the interests of any other members

of the Class. Defendants' unlawful, unfair, deceptive, and/or fraudulent actions and breaches of the duty of best execution concern the same business practices described herein irrespective of where they occurred or were experienced.

81.     *Adequacy. Rule 23(a)(4).* Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel experienced in complex consumer fraud class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no interest adverse or antagonistic to those of the Class.

82.     *Injunctive and Declaratory Relief. Rule 23(b)(2).* Defendants' actions regarding the misleading statements and omissions relating to their routing of client orders are uniform as to members of the Class. Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief as requested herein is appropriate respecting the Class as a whole.

83.     *Predominance and Superiority of Class Action. Rule 23(b)(3).* Questions of law or fact common to the Class predominate over any questions affecting only individual members and a class action is superior to other methods for the fast and efficient adjudication of this controversy, for at least the following reasons:

a.      Absent a class action, members of the Class as a practical matter will be unable to obtain redress. Defendants' violations of their legal obligations will continue without remedy, additional clients will be harmed, and Defendants will continue to retain their ill-gotten gains;

b.      It would be a substantial hardship for most individual members of the Class if they were forced to prosecute individual actions;

c.      When the liability of Defendants has been adjudicated, the Court will be able to determine the claims of all members of the Class;

CLASS ACTION COMPLAINT

d.      A class action will permit an orderly and expeditious administration of each Class member's claims and foster economies of time, effort, and expense;

e.      A class action regarding the issues in this case does not create any problems of manageability;

f.      Defendants have acted on grounds generally applicable to the members of the Class, making class-wide monetary relief appropriate;

g.      As a result of Defendants' actions and policies, each member of the Class suffered damages to an extent within the peculiar knowledge of the Defendants.

**CAUSES OF ACTION**

**COUNT I**

**BREACH OF FIDUCIARY DUTY**

**(ON BEHALF OF THE NATIONWIDE CLASS)**

84.      Plaintiffs hereby incorporate by reference the factual allegations contained herein.

85.      As a provider of financial services and a registered securities investment broker-dealer, at all times relevant herein Robinhood was a fiduciary to Plaintiffs and Class members and owed them the highest good faith and integrity in performing its financial services and acting as a securities broker-dealer on their behalf. As a broker-dealer, Robinhood provides securities trading services by taking, entering, and executing orders, and provides information and advice to customers on investments and investment strategies.

86.      Additionally, because Robinhood provides securities trading services through web and app-based services that accept orders 24 hours a day for execution during trading hours, it maintains a specific fiduciary duty to promptly notify its clients when it will be undertaking extraordinary measures, such as those described herein, that run counter to a client's directions and interests.

CLASS ACTION COMPLAINT

87.     Robinhood breached its fiduciary duties to Plaintiffs and Class members by, among other things, failing to disclose in a timely manner that it would cancel and restrict buy orders of the Manipulated Stocks; actually canceling and restricting buy orders; canceling and restricting buy orders of the Manipulated Stocks for its own monetary gain; failing to provide timely access to trading services; failing to timely process securities trades, including taking orders, entering orders, and executing orders; failing to keep records of trades (including attempted trades); and by failing to comply with applicable legal regulatory requirements and industry standards of care, including those set by FINRA and its predecessor authorities; and by making unauthorized transactions on customers' accounts.

88.     Robinhood's conduct has caused Plaintiffs' and Class members' harm, losses, and damages and continues to expose them to harm because Robinhood continues to breach its fiduciary duties. These losses reflect damages to Plaintiffs and Class members in an amount to be determined at trial or separate proceedings as necessary.

## COUNT II

## BREACH OF FIDUCIARY DUTY (950 MASS. CODE REGS. 12.200, *et seq.*)
## (ON BEHALF OF THE MASSACHUSETTS SUBCLASS)

89.     Plaintiffs hereby incorporate by reference the factual allegations contained herein.

90.     Plaintiff Feeney brings this count on behalf of himself and the putative Massachusetts Subclass.

91.     As a provider of financial services and a registered securities investment broker-dealer, at all times relevant herein Robinhood was a fiduciary to Plaintiffs and Class members and owed them the highest good faith and integrity in performing its financial services and acting as a securities broker-dealer on their behalf. As a broker-dealer, Robinhood provides

CLASS ACTION COMPLAINT

1   securities trading services by taking, entering, and executing orders, and provides information

2   and advice to customers on investments and investment strategies.

3         92.    Massachusetts' law imposes a fiduciary duty on broker-dealers that requires

4   them to adhere to duties of utmost care and loyalty to clients. The duty of care requires a

5   broker-dealer to use the care, skill, prudence, and diligence that a person acting in a like

6   capacity and familiar with such matters would use, taking into consideration all of the relevant

7   facts and circumstances. The duty of loyalty requires a broker-dealer to: (1) disclose all material

8   conflicts of interest; (2) make all reasonably practicable efforts to avoid conflicts of interest,

9   eliminate conflicts that cannot reasonable be avoided, and mitigate conflicts that cannot

10   reasonably be avoided or eliminated and (3) make recommendations and provide investment

11   advice without regard to the financial or any other interest of any party other than the customer

12         93.    Additionally, because Robinhood provides securities trading services through

13   web and app-based services that accept orders 24 hours a day for execution during trading

14   hours, it maintains a specific fiduciary duty to promptly notify its clients when it will be

15   undertaking extraordinary measures, such as those described herein, that run counter to a

16   client's directions and interests.

17         94.    Robinhood breached its fiduciary duties to Plaintiffs and Class members by,

18   among other things, failing to disclose in a timely manner that it would cancel and restrict buy

19   orders of the Manipulated Stocks; actually canceling and restricting buy orders; canceling and

20   restricting buy orders of the Manipulated Stocks for its own monetary gain; failing to provide

21   timely access to trading services; failing to timely process securities trades, including taking

22   orders, entering orders, and executing orders; failing to keep records of trades (including

23   attempted trades); and by failing to comply with applicable legal regulatory requirements and

24

1   industry standards of care, including those set by FINRA and its predecessor authorities; and by

2   making unauthorized transactions on customers' accounts.

3       95.    Robinhood's conduct has caused Plaintiffs' and Class members' harm, losses,

4   and damages and continues to expose them to harm because Robinhood continues to breach its

5   fiduciary duties. These losses reflect damages to Plaintiffs and Class members in an amount to

6   be determined at trial or separate proceedings as necessary.

7   **<u>COUNT III</u>**

8   **BREACH OF CONTRACT**

9   **(ON BEHALF OF THE NATIONWIDE CLASS)**

10       96.    Plaintiffs hereby incorporate by reference the factual allegations contained

11   herein.

12       97.    In order to use the Robinhood trading platform, a potential client must enter into

13   a Customer Agreement with Robinhood.  The agreement is a standardized contract of adhesion

14   imposed on Robinhood's clients as conditions of use and are not subject to negotiation.

15       98.    Robinhood breached its contracts with clients by failing to disclose in a timely

16   manner that it would cancel and restrict buy orders of the Manipulated Stocks; actually

17   canceling and restricting buy orders; knowingly disadvantaging its clients in a high stakes and

18   fast moving market and hindering their ability to use another platform by leading them to

19   believe that orders would be executed; canceling and restricting buy orders of the Manipulated

20   Stocks for its own monetary gain and at the expense of Plaintiffs and class members; failing to

21   provide timely access to trading services; and by failing to comply with applicable legal

22   regulatory requirements and industry standards of care, including those set by FINRA.

23       99.    Robinhood's failure to perform and its breaches of the Customer Agreement and

24   applicable contracts resulted in damages and losses to Plaintiffs and Class members and

25

–31–

continues to expose them to harm because Robinhood continues to fail to perform under the Customer Agreement. These losses reflect damages to Plaintiffs and Class members in an amount to be determined at trial.

100.     Additionally, because damages may not be a full and complete remedy due to the ongoing nature of the relationship between the parties and the continuing risk of future harm, Plaintiffs and Class members seek specific performance of the contracts to ensure Robinhood refrains from similar conduct in the future.

## COUNT IV

### BREACH OF IMPLIED COVENANT OF GOOD FAITH & FAIR DEALING

101.     Plaintiffs hereby incorporate by reference the factual allegations contained herein.

102.     As set forth above, Plaintiffs, Class members and Robinhood are parties to the Customer Agreement and related contracts.

103.     Robinhood unfairly interfered with Plaintiffs' and Class members' rights to receive the benefits of the Customer Agreement and related contracts by failing to perform under the contracts. This failure to perform specifically includes, but is not limited to, failing to disclose in a timely manner that it would cancel buy orders of the Manipulated Stocks after Robinhood had told its customers that such orders would be executed. It also includes actually canceling and restricting buy orders; canceling and restricting buy orders of the Manipulated Stocks for its own monetary gain; failing to provide timely access to trading services; failing to timely process securities trades, including taking orders, entering orders, and executing orders; failing to keep records of trades (including attempted trades); and by failing to comply with applicable legal regulatory requirements and industry standards of care, including those set by

CLASS ACTION COMPLAINT

FINRA and its predecessor authorities; and by making unauthorized transactions on customers' accounts.

104.     To the extent the contract gave Robinhood discretion regarding matters in the foregoing paragraph, Robinhood exercised its discretion in bad faith to maximize its own pecuniary benefit at the expense of Plaintiffs and class members.

105.     Robinhood's conduct has breached the implied covenant of good faith and fair dealing because it has caused Plaintiffs and Class members' harm, losses, and damages, and continues to expose them to harm because Robinhood continues to fail to perform under the Customer Agreement. These losses reflect damages to Plaintiffs and Class members in an amount to be determined at trial.

106.     Additionally, because damages may not be a full and complete remedy due to the ongoing nature of the relationship between the parties and the continuing risk of future harm, Plaintiffs and Class members seek specific performance of the contracts to ensure Robinhood refrains from similar conduct in the future.

## COUNT V

## NEGLIGENCE

## (ON BEHALF OF THE NATIONWIDE CLASS)

107.     Plaintiffs hereby incorporate by reference the factual allegations contained herein.

108.     As a provider of financial services and registered securities investment broker-dealer, Robinhood had a duty to exercise reasonable care, skill, and ability in conducting and facilitating financial services and transactions for its customers.

109.     Robinhood unlawfully breached its duties by, among other things, failing to disclose in a timely manner that it would cancel and restrict buy orders of the Manipulated

–33–

Stocks; actually canceling and restricting buy orders; knowingly disadvantaging its clients in a high stakes and fast moving market and hindering their ability to use another platform by leading them to believe that orders would be executed; canceling and restricting buy orders of the Manipulated Stocks for its own monetary gain and at the expense of Plaintiffs and class members; failing to provide timely access to trading services; and by failing to comply with applicable legal regulatory requirements and industry standards of care, including those set by FINRA.

110. As set forth below, Robinhood's conduct was so want of even scant care that its acts and omissions were and continue to be an extreme departure from the ordinary standard of conduct, rendering Robinhood not just negligent, but grossly negligent.

111. Robinhood's negligence and breaches of its duties owed to Plaintiffs and Class members proximately caused losses and damages that would not have occurred but for Robinhood's breach of its duty of due care. These losses reflect damages to Plaintiffs and Class members in an amount to be determined at trial.

## COUNT VI

### GROSS NEGLIGENCE

### (ON BEHALF OF THE NATIONWIDE CLASS)

112. Plaintiffs hereby incorporate by reference the factual allegations contained herein.

113. As a provider of financial services and registered securities investment broker-dealer, Robinhood had a duty to exercise reasonable care, skill, and ability in conducting and facilitating financial services and transactions for its customers.

114. Robinhood unlawfully breached its duties by, failing to disclose in a timely manner that it would cancel and restrict buy orders of the Manipulated Stocks; actually

–34–

CLASS ACTION COMPLAINT

canceling and restricting buy orders; knowingly disadvantaging its clients in a high stakes and fast moving market and hindering their ability to use another platform by leading them to believe that orders would be executed; canceling and restricting buy orders of the Manipulated Stocks for its own monetary gain and at the expense of Plaintiffs and class members; failing to provide timely access to trading services; and by failing to comply with applicable legal regulatory requirements and industry standards of care, including those set by FINRA.

115.    Robinhood's conduct as set forth in this Complaint was want of even scant care and its acts and omissions were and continue to be an extreme departure from the ordinary standard of conduct. Robinhood manipulated the market to disadvantage Plaintiffs and class members so that it could shore up its own balance sheet and satisfy its monetary obligations including to the DTCC. Robinhood's reckless disregard for its customers continues to fall so far below the standard of care required of it that it constitutes gross negligence.

116.    Robinhood's gross negligence and breaches of its duties owed to Plaintiffs and Class members proximately caused their losses and damages that they would not have occurred but for Robinhood's gross breaches of its duty of due care.  These losses reflect damages to Plaintiffs and Class members in an amount to be determined at trial.

<u>**COUNT VII**</u>

**VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW**

**(Cal. Bus. & Prof. Code § 17200, et seq.) ("UCL")**

**(ON BEHALF OF THE NATIONWIDE CLASS)**

117.    Plaintiffs hereby incorporate by reference the factual allegations contained herein.

118.    Robinhood has engaged in unfair competition within the meaning of California Business & Professions Code section 17200, *et seq*., because Robinhood's conduct is unlawful and unfair as herein alleged.

119.     Plaintiffs, the members of the Class, and Robinhood are a "person" or "persons," within the meaning of Section 17201 of the California Unfair Competition Law ("UCL").

120.     The UCL prohibits any unlawful and unfair business practices or acts. Robinhood's conduct, as alleged herein, constitutes an unlawful and unfair business practice that occurred in connection with the provision of its financial and investment broker services.

121.     **Unlawful prong:** Robinhood's conduct, as described within, violated the UCL's unlawful prong because it: (1) constitutes negligence and/or gross negligence; (2) constitutes a breach of fiduciary duty; (3) constitutes a breach of contract and/or a breach of the implied covenant of good faith and fair dealing; (4) it violated applicable regulatory laws and guidance including from the SEC and FINRA such as FINRA Rule 5310 which requires best execution of orders fully and promptly; and (5) has unlawfully and unjustly enriched Robinhood.

122.     **Unfair prong:** Robinhood's conduct, as described within, violated the UCL's unfair prong because its conduct violates established public policy intended to regulate financial services to consumers, and because it is immoral, unethical, oppressive, or unscrupulous and has caused injuries to the Plaintiffs and the Class that outweigh any purported benefit.  The utility of Robinhood's conduct to subordinate the financial interests of its clients to its own financial interests – including through the unilateral cancelation or sale of Manipulated Stocks is far outweighed by the gravity of harm to consumers who have now incurred losses and damages they would not have otherwise.

123.     Plaintiffs have standing to pursue this claim because they have been injured by virtue of suffering a loss of money and/or property as a result of the wrongful conduct alleged herein.

124.     The UCL is, by its express terms, a cumulative remedy, such that remedies under its provisions can be awarded in addition to those provided under separate statutory schemes

and/or common law remedies, such as those alleged in the other Counts of this Complaint.  See Cal. Bus. & Prof. Code § 17205.

125.    As a direct and proximate cause of Robinhood's conduct, which constitutes unlawful and unfair business practices, as herein alleged, Plaintiffs and Class members have been damaged and suffered ascertainable losses, thereby entitling them to recover restitution and equitable relief, including disgorgement or ill-gotten gains, refunds of moneys, interest, reasonable attorneys' fees, filing fees, and the costs of prosecuting this class action, as well as any and all other relief that may be available at law or equity.  Additionally, because Plaintiffs and Class members continue to have accounts and investments with Robinhood and intend to use Robinhood's services in the future, injunctive relief is warranted.

## COUNT VIII

### UNJUST ENRICHMENT

### (ON BEHALF OF THE NATIONWIDE CLASS)

126.    Plaintiffs hereby incorporate by reference the factual allegations contained herein.

127.    By its wrongful conduct described herein, Robinhood has obtained a benefit from Plaintiffs and Class members that includes, but is not limited to, satisfying financial obligations imposed by the DTCC, saving likely hundreds of millions of dollars in costs relating to call options on the Manipulated Stocks, and reducing the costs of shorting the Manipulated Stocks, which benefited Robinhood's close institutional partners and reduced Robinhood's exposure to short positions. Robinhood also continues to maintain accounts for Plaintiffs and class members, receiving their personal data, receiving payments for order flow, maintaining deposited funds, charging and/or receiving interest on accounts and margin balances, charging and/or receiving fees, commissions and Gold Membership fees, and increased capital

CLASS ACTION COMPLAINT

1    fundraising due to the high number of new and continuing users of its platform, which also

2    drives up Robinhood's valuation.

3        128.   Since Robinhood's profits, benefits, and other compensation were obtained by

4    improper means, Robinhood was unjustly enriched at the expense of Plaintiffs and Class

5    members and is not legally or equitably entitled to retain any of the benefits, compensation or

6    profits it realized.

7        129.   Plaintiffs and Class members seek an order of this Court requiring Robinhood to

8    refund, disgorge, and pay as restitution any profits, benefits, and other compensation obtained

9    by Robinhood from its wrongful conduct and/or the establishment of a constructive trust from

10   which Plaintiffs and Class members may seek restitution.

11   **PRAYER FOR RELIEF**

12   WHEREFORE, Plaintiffs pray for judgment against Robinhood, as follows:

13/14       a.   For an order certifying the proposed class and subclass and appointing Plaintiffs and their counsel to represent the class and subclass;

15       b.   Finding that Robinhood's conduct violates the statutes and laws referenced herein;

16       c.   Finding in favor of Plaintiffs, the Class, and Subclass on all counts asserted herein;

17/18       d.   Granting restitution, disgorgement and other equitable monetary relief to Plaintiffs, the Class, and Subclass;

19/20       e.   Granting declaratory and injunctive relief to enjoin Robinhood from engaging in the unlawful practices described in this complaint;

21/22       f.   Granting compensatory damages, the amount of which is to be determined at trial or through another separate proceeding;

23       g.   Granting pre- and post-judgment interest on all amounts awarded;

24       h.   Granting injunctive relief as pleaded or as the Court may deem proper;

CLASS ACTION COMPLAINT

i.    Awarding Plaintiffs and the class members reasonable attorneys' fees and costs of suit, including expert witness fees; and

j.    For an order awarding such other and further relief as this Court may deem just and proper.

### **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: February 2, 2021

By:    */s/ Selin Demir*

Selin Demir, Esq. (SBN 331418)
**MIGLIACCIO & RATHOD LLP**
388 Market Street, Suite 1300
San Francisco, CA 94111
Tel: (415) 489-7004

Nicholas A. Migliaccio, Esq.*
Jason S. Rathod, Esq.*
Bryan Faubus, Esq.
**MIGLIACCIO & RATHOD LLP**
412 H Street N.E.,
Washington, DC 20002
Tel: (202) 470-3520

* *pro hac vice* anticipated

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT